DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of conviction and sentence for involuntary manslaughter, following a bench trial in the Lucas County Court of Common Pleas. Because we conclude that there was insufficient evidence that appellant's acts were the proximate cause of the death of another, we reverse.
 {¶ 2} On March 1, 2004, at 12:30 p.m., an East Toledo woman called 911 to report a man beating a woman in an alley near the caller's home. A patrol officer responded, arriving eight minutes after the 911 call was initiated. What the officer found, however, was appellant, Elmore J. Watson, Jr., and 49 year old Debbie Stout emerging from the alley laughing and holding hands. According to the officer, both denied an altercation and Stout appeared neither disheveled nor injured.
 {¶ 3} At approximately 10:30 a.m. on the morning of March 2, 2004, a friend of Stout found her body in a Northwood motel. At autopsy, the coroner found contusions on Stout's chest, neck and legs, including what the coroner characterized as a "blunt force" bruise on her back, near the tenth rib. It was this blow, the coroner concluded, that ruptured Stout's spleen, leading to her death.
 {¶ 4} On March 11, 2004, a Lucas County Grand Jury indicted appellant for involuntary manslaughter, charging that the beating he gave Stout the day before she died caused her death. Appellant pled not guilty and the matter proceeded to a trial to the court. At the conclusion of the trial, the court found appellant guilty as charged. Following a presentence investigation, the court sentenced appellant to a four-year term of incarceration. This appeal followed.
 {¶ 5} Appellant sets forth the following three assignments of error:
 {¶ 6} "I. There was insufficient evidence to prove that if Watson struck Stout in the stomach area about 22 hours before she was found dead, that it was foreseeable that her spleen would rupture. During the time lapse, other intervening factors could have caused the injury to the back that actually caused the spleen damage. Proximate cause is an essential element of the voluntary manslaughter statute.
 {¶ 7} "II. Watson's conviction was against the manifest weight of the evidence due to the lack of credible evidence regarding whether Watson caused the injury to Stout's back that resulted in a ruptured spleen. And, whether the injury as described by the state's sole witness could have ruptured her spleen.
 {¶ 8} "III. The trial court unconstitutionally made findings of fact at the time of sentence."
 {¶ 9} We shall discuss appellant's first and second assignments of error together.
 {¶ 10} A verdict or finding may be overturned on appeal if it is either against the manifest weight of the evidence or because there is an insufficiency of evidence. In the former, the appeals court acts as a "thirteenth juror" to determine whether the trier of fact lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. In the latter, the court must determine whether the evidence submitted is legally sufficient to support all of the elements of the offense charged. Id. at 386-387. Specifically, we must determine whether the state has presented evidence which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The test is, viewing the evidence in a light most favorable to the prosecution, could any rational trier of fact have found the essential elements of the crime proven beyond a reasonable doubt. Id. at 390 (Cook, J., concurring); State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. See, also, State v. Eley (1978),56 Ohio St.2d 169; State v. Barns (1986), 25 Ohio St.3d 203.
 {¶ 11} Appellant was charged with a violation of R.C.2903.04(B). In material part, the statute provides that, "No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree, * * *."
 {¶ 12} One who violates this provision is guilty of involuntary manslaughter, a third degree felony.
 {¶ 13} At issue here is the element of proximate cause. The autopsy report described multiple small, purple contusions on Stout's legs, a red contusion on her wrist, a faint pink contusion on her upper chest at the base of her neck and a one by three-fourth inch purple contusion on the left side of her back, "at approximately the level of the posterior tenth rib." The deputy coroner who conducted the autopsy testified that it was this last bruise, evidence of some sort of blunt trauma, that led to Stout's death.
 {¶ 14} According to the coroner, the blow that caused this bruise ruptured the spleen, causing it to bleed into the "saran wrap" like capsule that surrounds it. Over time, blood flowing into the capsule exerted pressure on it, eventually causing it to burst. Once the capsule burst, death by exsanguination followed within 15 to 20 minutes. The coroner noted Stout suffered from cirrhosis of the liver which makes those affected "bleed at a faster rate." The coroner testified that the period from injury to death could be as little as four hours or as long as 30 hours, with 30 hours being "a little long."
 {¶ 15} With respect to the injury itself, on direct examination the coroner testified that the blow that caused Stout's spleen to rupture could have been from being kicked or from a closed fist. On cross examination, the coroner conceded that the injury could also have been the result of accidental contact with an object or "* * * slipping and hitting one's portion of the body or the back against the toilet * * * or falling off a bed and hitting a portion of the body on the bed * * *."
 {¶ 16} What is known of Debbie Stout's activities between the time of the reported beating and the discovery of her body came from the testimony of her friend, Gregory Harrison. Harrison testified that, when he visited an East Toledo tavern shortly after 1:00 p.m. on March 1, he found Debbie Stout at the bar. According to Harrison, at that time he did not see any bruises on Stout, nor did she appear injured.
 {¶ 17} After a short time at the tavern, Stout asked Harrison to help her find another friend named "Jake." This quest took the two of them past Jake's apartment and several other east side Toledo taverns. At some point during this drive, Harrison testified, Stout indicated that her "ribs were hurting her." Eventually, Stout asked Harrison to drop her off at Jake's home to wait for his return. Later that afternoon, Harrison reported, Stout called him at home, apparently asking that he help get her a room.
 {¶ 18} Harrison drove Stout to a Northwood motel and, after purchasing a room for her, left to acquire food, cigarettes, aspirin and vodka. When he returned, at approximately 5:30 p.m., he left these items with Stout and told her that he would be back before 11:00 the next morning to pick her up. Harrison found Stout's body at 10:25 a.m. the next day.
 {¶ 19} The state's theory of the case is that during the beating reported to the police at 12:30 p.m. on March 1, appellant inflicted the injury which led to Stout's death some 20 hours later. The autopsy showed a bruise on the left side of Stout's back. The coroner testified that while the blow that caused this bruise could have come from any number of sources, "* * * it wouldn't be a tap. It would be a fairly heavy blow." During closing, the state conceded that any number of events could have caused the blow that ruptured Stout's spleen, but argued that it was beyond coincidence that appellant would be seen inflicting a blow in the same spot just 20 hours before she died. On appeal, the state characterizes the evidence as testimony from a witness that appellant was taking "body shots" to Stout's ribs and back.
 {¶ 20} The only witness to the events in the alley on March 1, 2004, was the 911 caller. At trial, she testified:
 {¶ 21} "Q. Could you describe to the Court what you saw, what this man was doing to this lady?
 {¶ 22} "A. When I looked at him and seen what he was doing, he was sitting there beating the lady up.
 {¶ 23} "Q. Can you describe how he was doing this? Was he using his hands, his feet or both?
 {¶ 24} "A. He was — he was doing body shots to her ribs. Her arms was covered up like this (indicating). And he was beating her against her ribs.
 {¶ 25} "[Prosecutor]: The record shows that the witness was indicating with both arms, with her elbows bent, fingers up close to her face like she was protecting herself against body shots.
 {¶ 26} "Q. Do you remember, as best you can, how many times you saw this man hitting this woman?
 {¶ 27} "A. Oh, what I could see, probably maybe about 10, 15 times maybe.
 {¶ 28} "Q. Where on her body was she being struck by him?
 {¶ 29} "A. Up on the lower arms and the rib part (indicating).
 {¶ 30} "Q. You're indicating your left arm, the upper shoulder part?
 {¶ 31} "A. Above both arms and the rib parts.
 {¶ 32} "Q. All right. Did you see him strike her in the face?
 {¶ 33} "A. No, I didn't.
 {¶ 34} "Q. Did you see him at any time kick her?
 {¶ 35} "A. No, I didn't.
 {¶ 36} "Q. Did you see her at any time try to fight back with him?
 {¶ 37} "A. No. She never did. She was too scared.
 {¶ 38} "* * *
 {¶ 39} "Q. Describe the area where this beating was taking place. Is it an open field? Is it a street?
 {¶ 40} "A. It was in an alley right next to the garage.
 {¶ 41} "Q. Was she forced up against the garage?
 {¶ 42} "A. Not that I've seen. She was backed up towards, down with her head over.
 {¶ 43} "Q. Was this alley and/or the garage surrounded by any sort of fence?
 {¶ 44} "A. Yes, there was.
 {¶ 45} "Q. What type of fence?
 {¶ 46} "A. Like a steel fence, chain link fence.
 {¶ 47} "* * *
 {¶ 48} "Q. Did you ever see her against that fence?
 {¶ 49} "A. No, sir.
 {¶ 50} "Q. You saw her against the garage?
 {¶ 51} "A. Yes."
 {¶ 52} Appellant did not testify, but statements he made to police were admitted in through testimony of the investigating officer. Appellant admitted that he had a confrontation with Stout in the alley and that the two had "tussled." The officer testified that appellant conceded that "there may have been some pushing. He denied that there was any punches." According to the investigating officer, when confronted with eyewitness reports that he had hit Stout "10 to 15 times in the shoulders and in the ribs," appellant responded that "there may have been pushing. He said he never went to the ground with her, but he — denied — acknowledged that he was throwing punches."
 {¶ 53} There is little question that the state has evidentiary problems with proving proximate cause in this case. The 20-hour period between the alleged injury and death presses the outside limits of what is medically possible. The testimony of the police officer investigating the 911 call was that, immediately following the alleged injury, Stout appeared uninjured and composed. Stout was characterized in testimony as an alcoholic, a prostitute and sometime crack cocaine user: all risk enhancing attributes. There are long unaccounted for periods between the incident in the alley and Stout's death during which she could have been injured by someone else or injured herself. Nevertheless, we concur with the state that these deficiencies are overcome by evidence that appellant struck a blow on Stout's body which could have ruptured her spleen. The problem is that there is no such evidence in the record.
 {¶ 54} The coroner testified that the blow that caused Stout's death was a fairly heavy blunt impact with the left side of Stout's back at the tenth rib. The 911 caller, the only witness to the events in the alley, if wholly credited, describes only blows to Stout's arms and ribs from a face-to-face stance. Moreover, although there was some witness confusion as to whether Stout was ever backed against a garage, nothing suggests that may have been done with any force. Absent such testimony, we cannot say that the state presented sufficient evidence that appellant's blows were the proximate cause of Stout's death.
 {¶ 55} Accordingly, appellant's first and second assignments of error are well-taken. His remaining assignment of error is moot.
 {¶ 56} On consideration whereof, the judgment of the Lucas County Court of Common Pleas is reversed. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
Judgment Reversed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Pietrykowski, J. Singer, P.J. Skow, J. concur.